# 20-3849-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———————————————

TEMIMA SPETNER, JASON KIRSCHENBAUM, ISABELLE
KIRSCHENBAUM, individually and for the Estate of MARTIN
KIRSCHENBAUM, JOSHUA KIRSCHENBAUM, SHOSHANA BURGETT,
DAVID KIRSCHENBAUM, DANIELLE TEITELBAUM, NETANEL MILLER,
CHAYA MILLER, AHARON MILLER, SHANI MILLER, ADIYA MILLER,
ALTEA STEINHERZ, JONATHAN STEINHERZ, TEMIMA STEINHERZ,
JOSEPH GINZBERG, PETER STEINHERZ, LAUREL STEINHERZ,
JACQUELINE CHAMBERS, individually and as the Administrator of the Estate
of ESTHER BABLAR, LEVANA COHEN, individually and as the Administrator
of the Estate of ESTHER BABLAR, ELI COHEN, SARAH ELYAKIM, JOSEPH
COHEN, GRETA GELLER, as the Administrator of the Estate of GRETA
GELLER, ILANA DORFMAN, as the Administrator of the Estate of

———————————————

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

GASSAN A. BALOUL
SQUIRE PATTON BOGGS
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

– and –

MITCHELL R. BERGER
SQUIRE PATTON BOGGS
1211 Avenue of the Americas, 26th Floor
New York New York 10036
(212) 872-9800

*Attorneys for Defendant-Appellee*

GRETA GELLER, REPHAEL KITSIS, as the Administrator of the Estate of
GRETA GELLER, TOVA GUTTMAN, as the Administrator of the Estate of
GRETA GELLER, GILA ALUF, SHABTAI SHATSKY, individually and for the
Estate of KEREN SHATSKY, JOANNE SHATSKY, individually and for the
Estate of KEREN SHATSKY, TZIPPORA SHATSKY SCHWARZ, YOSEF
SHATSKY, SARA SHATSKY TZIMMERMAN, MIRIAM SHATSKY, DAVID
SHATSKY, HILLEL TRATTNER, RONIT TRATTNER, ARON TRATTNER,
SHELLEY TRATTNER, HADASSAH DINER, EFRAT FINE, YAEL
HILLMAN, CHANA FRIEDMAN EDRI, BELLA FRIEDMAN, REUVEN
FRIEDMAN, YEHIEL FRIEDMAN, ZVI FRIEDMAN, ILAN FRIEDMAN,
MIRIAM FRIEDMAN SCHREIBER, STEVEN BRAUN, CHAVIVA BRAUN,
YEHUDA BRAUN, YONI BRAUN, ELIANA BRAUN PERETZ, ORIELLA
BRAUN, MATANYA BRAUN, GINETTE THALER, individually and for the
Estate of RACHEL THALER, LEOR THALER, MICHAEL THALER, ZVI
THALER, ISAAC THALER, MIRIAM BEN-YISHAI, individually and for the
Estate of SHOSHANA BEN-YISHAI, YITZHAK BEN-YISHAI, individually
and for the Estate of SHOSHANA BEN-YISHAI, JACOB BEN-YISHAI,
ISRAEL BEN-YISHAI, AVIEL BEN-YISHAI, CHANA BEN-YISHAI, YAEL
BEN-YISHAI, MYRIAM MILLER, CHANA AIDEL MILLER SCHERTZMAN,
TOVA MILLER, ILANA SCHERTZMAN COHEN, LESLIE SCHERTZMAN,
DONALD SCHERTZMAN, DANIEL SCHERTZMAN, ARIELLE
SCHERTZMAN FISHER, ABRAHAM SCHERTZMAN, YEHUDA
SCHERTZMAN, CHARLES O. MORGAN, JR., for the Estate of GLORIA
KUSHNER, LEONARD MANDELKORN, EZRA KESSLER, HANNAH
KESSLER ROSENSTEIN, KLILA KESSLER, YITZHAK ZAHAVY, JULIE
ZAHAVY, TZVEE ZAHAVY, BERNICE ZAHAVY, MARK SOKOLOW,
RENA SOKOLOW, JAMIE SOKOLOW FENSTER, LAUREN SOKOLOW
MANDELSTAM, ELANA SOKOLOW ROSMAN, ALAN BAUER,
YEHONATON BAUER, REVITAL BAUER, BINYAMIN BAUER, DANIEL
BAUER, YEHUDA BAUER, LUDWIG BAUER, individually and for the Estate
of ELLA BAUER, PHILLIP BAUER, SHOSHANA ZELCER WEITZMAN,
SHMUEL WALDMAN, HENNA NOVACK, MORRIS WALDMAN, EVA
WALDMAN, CHANIE BODENSTEIN, SHAINDY WEINBERGER, PHILIP
WALDMAN, ABRAHAM WALDMAN, DASSIE WALDMAN DAVIS,
LESLYE KNOX, individually and for the Estate of AHARON ELLIS, JORDAN
ELLIS, MELLO NEE ELLIS, individually and for the Estate of PRINCE
ELKANNANN BEN SHALEAK, AMETAI CARTER, REUVEN CARTER,
SHAANON CARTER, SHAYRAH CARTER, YOSHAHVYAH CARTER,
FRANCINE ELLIS, LYNNE ELLIS, SHEMARIYAH ELLIS, TSAPHRERAH
ELLIS, YIHONADOV ELLIS,

*Plaintiffs-Appellants*,

ARIE MILLER,

*Plaintiff*,

– v. –

PALESTINE INVESTMENT BANK,

*Defendant-Appellee.*

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Circuit Rule 26.1, counsel for Defendant Palestine Investment Bank hereby certify the following: Palestine Investment Bank does not have a parent corporation; and no publicly held corporation owns 10% or more of the Palestine Investment Bank's stock.

Dated: May 28, 2021                    */s/ Gassan A. Baloul*
                                       Gassan A. Baloul

                                       *Attorney for Defendant-Appellee*
                                       *Palestine Investment Bank*

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS.............................................................................. ii

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF ISSUES .............................................................................1

PRELIMINARY STATEMENT .........................................................................2

STATEMENT OF THE CASE .........................................................................4

A.  PIB Conducted only Offshore Dollar-Denominated Transactions During the Relevant Period...........................................................................................6

B.  The District Court Granted PIB's Motion to Dismiss for Lack of Personal Jurisdiction...............................................................................................11

SUMMARY OF THE ARGUMENT .................................................................16

ARGUMENT .............................................................................................19

I.   Standards of Review .........................................................................19

II.  Under *Licci*, a Foreign Bank is Subject to Jurisdiction in New York Only if it Maintains and Uses Its Own Correspondent Account Here...............................21

III.   AJIB Did Not Act as PIB's "Agent" for Purposes of Personal Jurisdiction by Maintaining a Correspondent Banking Relationship with PIB Outside the United States...............................................................................................27

IV.   The PMA Was Not PIB's "Agent" for Purposes of the Long-Arm Statute.39

V.  Plaintiffs' Allegation Regarding One Inbound Transfer for HLF Does Not Support a Finding that PIB Transacted Business in New York. ..........................46

CONCLUSION..........................................................................................51

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
   731 F.2d 112 (2d Cir. 1984) ......................................................................... *passim*

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.*,
   39 N.Y.2d 391 (1976) ............................................................................23

*Anderson Grp., LLC v. City of Saratoga Springs*,
   805 F.3d 34 (2d Cir. 2015) ....................................................................42

*Banco Urquijo, S.A. v. Signet Bank*,
   861 F. Supp. 1220 (M.D. Pa. 1994) ......................................................28

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007) ..................................................................19

*Bidonthecity.com LLC v. Halverston Holdings Ltd.*,
   No. 12-cv-9258, 2014 U.S. Dist. LEXIS 45891, 2014 WL 1331046 (S.D.N.Y.
   Mar. 31, 2014) ......................................................................................34

*Bogle-Assegai v. Connecticut*,
   470 F.3d 498 (2d Cir. 2006) ..................................................................42

*Butto v. Collecto Inc.*,
   845 F. Supp. 2d 491 (E.D.N.Y. Feb. 23, 2012) ....................................28

*Cabrera v. Jakabovitz*,
   24 F.3d 372 (2d Cir. 1994) ....................................................................19

*Calderon-Cardona v. Bank of N.Y. Mellon*,
   770 F.3d 993 (2d Cir. 2014) ....................................................... 17, 28, 32

*Chloé v. Queen Bee of Beverly Hills, LLC*,
   616 F.3d 158 (2d Cir. 2010) ..................................................................20

*CutCo Indus., Inc. v. Naughton*,
   806 F.2d 361 (2d Cir. 1986) ....................................................... 13, 30, 31

*Delbrueck & Co. v. Mfr. Hanover Trust Co.*,
   609 F.2d 1047 (2d Cir. 1979) .................................................................29

*Emerald Asset Advisors, LLC v. Schaffer*,
   895 F. Supp. 2d 418 (E.D.N.Y. 2012) ....................................................35

*Export-Import Bank of the United States v. Asia Pulp & Paper Co.*,
   609 F.3d 111 (2d Cir. 2010) ........................................... 17, 28, 29, 31

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*,
   866 F.2d 38 (2d Cir. 1989) ............................................................ 44, 45

*Hau Yin To v. HSBC Holdings, PLC*,
   700 F. App'x 66 (2d Cir. 2017) (summary order) ......................... 19, 31

*Hawthorne v. Am. Mortg., Inc.*,
   489 F. Supp. 2d 480 (E.D. Pa. 2007) ....................................................28

*In re Arcapita*,
   549 B.R. 56 (S.D.N.Y. 2016) ......................................... 41, 48, 49

*In re Koreag, Controle et Revision S.A.*,
   961 F.2d 341 (2d Cir. 1992) ............................................................ 28, 29

*In re Nortel Networks Corp. Sec. Litig.*,
   539 F.3d 129 (2d Cir. 2008) (per curiam) ............................................42

*Joint Stock Co. v. Infomir LLC*,
   No. 16 Civ. 1318, 2018 U.S. Dist. LEXIS 167773 (S.D.N.Y. Sep. 28, 2018).....20

*JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*,
   412 F.3d 418 (2d Cir. 2005) .................................................................35

*Licci v. Lebanese Can. Bank, SAL*,
   20 N.Y.3d 327 (N.Y. 2012) ("*Licci III*") ........................................ 22, 24

*Licci v. Lebanese Canadian Bank*,
   732 F.3d 161 (2d Cir. 2013) ("*Licci IV*") ..................................... *passim*

*Licci v. Lebanese Canadian Bank, SAL*,
   673 F.3d 50 (2d Cir. 2012) ("*Licci II*").................................... 19, 20, 44

*MacDermid, Inc. v. Deiter*,
  702 F.3d 725 (2d Cir. 2012) ...............................................20

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*,
  264 F.3d 32 (2d Cir. 2001) ........................................... 19, 30

*Matter of Bennett Funding Group, Inc.*,
  336 F.3d 94 (2d Cir. 2003) ........................................... 34, 35

*National Union Fire Ins. Co. v. BP Amoco P.L.C.*,
  319 F. Supp. 2d 352 (S.D.N.Y. 2004) ........................... 33, 34

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  609 F.3d 30 (2d Cir. 2010) ...............................................20

*Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*,
  No. 18-cv-3528, 2019 U.S. Dist. LEXIS 100901
  (E.D.N.Y. June 17, 2019) ............................................ 20, 21

*Sec. Fund Servs., Inc. v. Am. Nat'l Bank & Tr. Co.*,
  542 F. Supp. 323 (N.D. Ill. 1982) .....................................29

*Sunward Elecs., Inc. v. McDonald*,
  362 F.3d 17 (2d Cir. 2004) ...............................................19

*Tamam v. Fransabank SAL*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010) ...............................24

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
  135 F. Supp. 3d 219 (S.D.N.Y. 2015) ...............................20

*Thompson v. First BankAmericano*,
  518 F.3d 128 (2d Cir. 2008) ......................................... 44, 45

*Trisvan v. Heyman*,
  305 F. Supp. 3d 381 (E.D.N.Y. 2018) ...............................20

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*,
  241 F.3d 135 (2d Cir. 2001) .............................................19

*United States v. Braunig*,
  553 F.2d 777 (2d Cir. 1977) .............................................42

*United States v. Snow*,
  462 F.3d 55 (2d Cir. 2006) ......................................................................20

*Walden v. Fiore*,
  571 U.S. 277 (2014)........................................................................ 23, 29

*Waldman v. PLO*,
  835 F.3d 317 (2d Cir. 2016) ................................................. 26, 29, 48

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ....................................................................42

*Wells Fargo Bank, N.A. v. Citizens Bank of Tex., N.A.*, 181 S.W.3d 790
  (Tex. App. 2005)....................................................................................28

*Wellton Int'l Express v. Bank of China (Hong Kong)*,
  No. 19-cv-6834, 2020 U.S. Dist. LEXIS 59224, 2020 WL 1659889
  (S.D.N.Y. Apr. 3, 2020)................................................................. 32, 33

## Statutes

18 U.S.C. § 2331 *et seq*..........................................................................5

N.Y. U.C.C. § 4.......................................................................................32

N.Y. U.C.C. § 4-105 ......................................................................... 43, 44

N.Y. U.C.C. § 4-201 ..................................................................... 12, 44, 46

N.Y. U.C.C. § 4-A .......................................................................... 32, 33

N.Y. U.C.C. § 4-A-104 .........................................................................32

## Rules

N.Y. C.P.L.R. § 302.......................................................................... *passim*

**STATEMENT OF ISSUES**

1.      Did the district court commit clear error in rejecting jurisdiction over Palestine Investment Bank ("PIB") under N.Y. C.P.L.R. § 302(a)(1) based on its factual findings that PIB did not maintain a correspondent account with any United States bank during the relevant period, and that neither PIB's Jordanian correspondent bank, Arab Jordan Investment Bank ("AJIB"), nor PIB's regulator, the Palestine Monetary Authority ("PMA"), was PIB's "agent" under N.Y. C.P.L.R. § 302(a)(1) in connection with AJIB and PMA wire transfers through their own New York correspondent bank accounts?

2.      Did the district court commit clear error in rejecting jurisdiction over PIB based on its factual findings that PIB did not transact business in New York for purposes of N.Y. C.P.L.R. § 302(a)(1), when PIB did not direct or control a wire transfer to PIB alleged by Plaintiffs, which was initiated in the United States by the Holy Land Foundation through its own bank in August 2001?

## PRELIMINARY STATEMENT

The district court aptly summarized its decision to dismiss Plaintiffs' claims

for lack of jurisdiction under N.Y. C.P.L.R. § 302(a), noting:

> This case is about a foreign bank with no New York presence or contacts during the relevant period.  It had no branches, offices, accounts, employees, or customers in New York.  It is not alleged to have solicited business, marketed its services, or had any communications in New York during the relevant period.  And, the third parties PIB worked with did not serve as its agents in New York. … [T]he Court finds that PIB did not purposefully avail itself of the privilege of conducting activities in New York directly or through an agent during the relevant period.

Special Appendix ("SPA") at 39.

The district court's rejection of jurisdiction under N.Y. C.P.L.R. § 302(a)

correctly applied *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 171 (2d Cir. 2013)

("*Licci IV*"), to hold that PIB made the "deliberate[] cho[ice]" that *Licci* allowed—to

process dollar-denominated transactions outside the United States, rather than

through a correspondent account with a New York bank.  PIB did not have its own

correspondent account with a U.S. bank during the relevant time.  Instead, PIB

processed its dollar transactions offshore, primarily with a Jordanian bank (AJIB) or

with the Palestinian bank regulator (PMA), which had their own correspondent

accounts with New York banks.

*Licci* emphasized that foreign banks have choices, and "could have . . .

processed U.S. dollar-denominated wire transfers . . . through correspondent accounts

anywhere in the world", and would be subject to U.S. jurisdiction if they "deliberately

- 2 -

chose to process . . . wire transfers through [banks] in New York." *Licci IV*, 732 F.3d at 171. Plaintiffs contend that the choice identified by this Court in *Licci IV* does not matter at all, and that foreign banks like PIB are subject to jurisdiction even when they deliberately choose to clear dollar-denominated transactions "anywhere in the world" outside the United States. This argument defies *Licci IV* and, if accepted, would undo it.

The district court also correctly rejected Plaintiffs' argument that PIB transacted business in New York through an "agent" when PIB's Jordanian correspondent (AJIB), and PIB's regulator (PMA), processed transactions through their own New York correspondent bank accounts that allegedly were related to PIB's offshore transactions with those entities. "Importantly," as the district court noted, "the Complaint does not allege that AJIB was a member of [a] conspiracy" with PIB (SPA-11), meaning that AJIB's relationship with PIB is tested under standard correspondent-banking principles, rather than co-conspirator tort principles.

The district court accordingly applied longstanding C.P.L.R. § 302 standards to undisputed facts to hold correctly that neither AJIB nor PMA was PIB's agent, because PIB did not control AJIB's or PMA's wire transfers through their own correspondent banks. Plaintiffs contend that all correspondent banking relationships create agency relationships, such that the New York correspondent-banking transactions of AJIB and PMA can be imputed to PIB. This argument defies this Court's precedent that correspondent banking does not establish agency relationships

- 3 -

and, if accepted, would fundamentally upset settled expectations concerning ownership of electronic funds transfers among banks.

Finally, the district court correctly found that PIB did not transact business in New York for purposes of C.P.L.R. § 302(a)(1), because PIB did not direct or control an alleged wire transfer initiated in the United States by the Holy Land Foundation through its own bank in August 2001. SPA 33-38.

In sum, the district court did not commit clear error in the factual findings underpinning its conclusion that "PIB did not purposefully avail itself of the privilege of conducting activities in New York directly or through an agent during the relevant period." SPA-39. In turn, those factual findings necessarily support the district court's conclusion that "personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1) is lacking because PIB is not alleged to have transacted business in New York in person or through an agent as required for the exercise of long-arm jurisdiction." SPA-40-41. This Court should affirm.

## STATEMENT OF THE CASE

Plaintiffs allege they are the victims, or the relatives or estates of the victims, of terror attacks in Israel committed by individuals affiliated with various terrorist groups between November 2001 and October 2002. *See generally* Joint Appendix ("A") at 120-168. Plaintiffs further allege that those attacks "were incentivized and rewarded by Saddam Hussein, who diverted money sent to Iraq under the United

Nations' humanitarian Oil-for-Food Program to pay the families of terrorists killed in suicide missions." SPA-2.

However, Plaintiffs have not sued the individual attackers or the terrorist groups they claim committed the attacks, or the Iraqi government or other organizations they claim funded the attacks or provided funds to the family members of the attackers. Instead, they have brought multiple lawsuits—several of which previously have been before this Court—against financial institutions that, they allege, provided banking services to individuals or entities that Plaintiffs claim funded or are otherwise related to the terrorist organizations whose members allegedly committed the attacks.[1] In this action, Plaintiffs claim that a Palestinian bank, PIB, is liable for their injuries under the Anti-Terrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2331 *et seq*. This despite the fact that, as Plaintiffs acknowledge, PIB did nothing more than allegedly provide routine financial services to two customers: an organization, Holy Land Foundation ("HLF"), which was not, at the time, designated

---

[1] Some or all of the Plaintiffs here are (or were) also asserting claims arising out of the same attacks in, among other cases, *Weiss v. National Westminster Bank PLC*, 05-cv-4622 (DLI) (RML) (E.D.N.Y.); *Applebaum v. National Westminster Bank PLC*, 07-cv-916 (DLI) (RML) (E.D.N.Y.); *Averbach, et al. v. Cairo Amman Bank*, 19-cv-00004 (GHW) (S.D.N.Y.); *Miller, et al. v. Arab Bank, PLC*, 18-cv-02192 (BMC) (E.D.N.Y.); and *Honickman, et al. v. Blom Bank*, 19-cv-00008 (KAM) (E.D.N.Y.).

as a terrorist organization by the United States; and an individual, Rakad Salem, who was not at the time (and today, is not) designated as a terrorist anywhere in the world.

## A.  PIB Conducted only Offshore Dollar-Denominated Transactions During the Relevant Period.

PIB is "a Palestinian bank headquartered in Ramallah-al-Bireh, in the Palestinian Territories."  A-116, ¶ 1; *see generally* A-168, ¶¶ 463-66.  It was established as a Palestinian company in 1994 and is now listed on the Palestine Exchange.  A-168.  As a commercial bank headquartered in Ramallah, Palestine, PIB is regulated by the PMA, the regulator for all banks in Palestine.  A-210, ¶ 9.

PIB is not now, and has never been, incorporated, licensed, registered as a foreign corporation, or otherwise authorized to conduct business anywhere in the United States.  A-211, ¶ 11.  It does not have a branch, office, subsidiary, agency, or other regular place of business anywhere in the United States; does not own, lease, or occupy any real property in the United States; and has no employees, directors, or officers in the United States; nor did it have any of these between September 2001 and March 2003, the "relevant period" in this action.  *Id*., ¶¶ 12-14.  Accordingly, as Plaintiffs concede, there is no basis for general jurisdiction over PIB.

Moreover, during the relevant period, and at all relevant times before 2009, PIB did not have a correspondent banking account with any bank in the United States.  *Id*., ¶ 15.  During the relevant period, and at all relevant times prior to 2009, PIB processed dollar-denominated transactions for its customers entirely <u>outside</u> the

United States, and in different ways based on the nature of the transactions. *Id.*, ¶ 16. Dollar-denominated transfers from one PIB account-holder to another, such as checks drawn on one PIB account for payment into another PIB account, were cleared on PIB's own books. *Id.*, ¶ 17.

For dollar-denominated transactions involving an account-holder at PIB and counter-parties <u>outside</u> Palestine, PIB maintained correspondent banking relationships with <u>non-U.S.</u> correspondent banks, primarily AJIB, which is based in Amman, Jordan. A-211-12, ¶¶ 15, 23. During the relevant period, dollar-denominated transfers between account-holders at PIB and third parties outside Palestine were cleared through PIB's correspondent banking relationships with those non-U.S. correspondent banks, primarily AJIB. *Id*.

To process a dollar-denominated transfer from a PIB account-holder to a counter-party outside of Palestine (an "outbound transfer") through AJIB during the relevant period, PIB would debit its account-holder's account in the amount of the transfer and credit AJIB's correspondent account in the same amount. A-212, ¶ 24. PIB would then send AJIB a credit entry notification and request that AJIB process the outbound transfer to the beneficiary on behalf of PIB's customer. *Id.* When a bank outside Palestine, on behalf of its customer (the "originator") wanted to send a dollar-denominated transfer to a PIB account-holder (an "inbound transfer") during the relevant period, the originator's bank would send the transfer to AJIB for the benefit of the PIB account-holder. *Id.*, ¶ 25. AJIB would then credit PIB's

correspondent account in the amount of the transfer, and send a notification to PIB informing PIB of the transfer, and asking PIB to credit its customer's account.  *Id.* PIB would then debit AJIB's correspondent account in the amount of the transfer, and credit the funds to its account-holder's account.  *Id.*  In other words, and as is common in international correspondent banking, U.S. dollar transfers between PIB and AJIB were settled entirely by way of book entries—that is, credits and debits to the correspondent (or "nostro-vostro") accounts PIB and AJIB each held on the books of the other—rather than by wiring funds between the two banks.  *Id.*, ¶ 26.

PIB and AJIB are, and during the relevant period were, operationally and financially independent of one another.  *See generally* A-250.  PIB and AJIB are not now, and have never been, part of a parent-subsidiary or affiliate relationship, nor have they ever been "related" entities as part of any larger corporate structure.  *Id.*, ¶ 19.  During the relevant period, the individuals comprising PIB's senior management team were entirely independent of AJIB and were not employed by AJIB.  *Id.*, ¶ 25.  Neither AJIB nor PIB has any ownership stake in the other.  A-251, ¶ 26.

All outbound transfers for, and inbound transfers to, PIB account-holders were accomplished entirely outside the United States by way of book-entry transactions between PIB and AJIB.  A-213, ¶ 28.  With respect to both outbound transfers and inbound transfers, PIB did not participate in, direct, or control whatever relationships AJIB may have had with any other banks (whether in or outside of the United States)

- 8 -

that may have been correspondents of AJIB for dollar-denominated business. *Id.*
PIB never controlled how AJIB processed any dollar-denominated or other
transactions through a U.S. bank. *Id.*, ¶ 29. Rather, AJIB made its own decisions
about whether it would use its U.S. correspondent banks, and who those
correspondents would be. *Id.* With respect to particular correspondent-banking
transactions, PIB did not direct or control AJIB's decisions about how AJIB selected
or used its correspondent banks, or how AJIB cleared dollar-denominated
transactions; nor did PIB control how AJIB processed funds to or through the United
States. A-248-249.

Beginning in 1995, all Palestinian banks, including PIB, have been required to
participate in the PMA's system for clearing and settling transactions between
Palestinian banks. A-211, ¶ 10. Accordingly, during the relevant period, dollar-
denominated checks and transfers within Palestine, *i.e.* between an account-holder at
PIB and an account-holder at another Palestinian bank (or a Palestinian branch of a
foreign bank) were processed through the PMA's clearing and settlement system.
*Id.*, ¶ 18. Through this system, dollar-denominated transactions among Palestinian
commercial banks (like PIB) were set off against one another on a daily basis, leaving
each bank with either a net credit owed to it from the other banks, or a net debt owed
to the other banks, depending on that day's transactional activity. *Id.*, ¶ 19. If a bank
owed a net debt to other banks, it was required to settle that debt by transferring funds
in dollars to the account the PMA had designated for this purpose. *Id.* The PMA

would then distribute those funds to the banks to which the debt was owed. *Id.* During the relevant period, the PMA designated its account at Arab Bank's branch in Ramallah, Palestine for this purpose. A-212, ¶ 20. As part of that process, the PMA required all Palestinian banks, including PIB, to send transfers to settle the net credits or debts resulting from that day's transactions to the PMA's designated account at Arab Bank-Ramallah, through the PMA's correspondent account at Arab Bank-New York. *Id.* PIB had no involvement in the PMA's designation of its account at Arab Bank-Ramallah for receiving these transfers or the PMA's instruction to route these transfers through its account at Arab Bank-New York. *Id.*, ¶ 21.

Plaintiffs' amended complaint identifies <u>one</u> transaction allegedly sent to PIB for the benefit of the HLF, which Plaintiffs allege is an organization affiliated with the terrorist group Hamas. A-117, ¶ 4. That one transaction allegedly was initiated by HLF through its own account at its own bank, BankOne in Richardson, Texas, and then routed through AJIB's correspondent account at Chase Manhattan Bank, for the ultimate benefit of HLF's account at PIB in Ramallah. SPA-14. The transaction is dated August 23, 2001—<u>before</u> the September 2001-March 2003 "relevant period" as defined in Plaintiffs' amended complaint. A-116, ¶ 2; A-187, ¶ 574; SPA-14 (noting that "Plaintiffs supply only this one example of an HLF funds transfer (predating the relevant period)"). Moreover, Plaintiffs admit that HLF was not designated as a terrorist by the U.S. government until December 2001, months <u>after</u>

the single alleged transaction. A-117-118, ¶ 11. Plaintiffs do not plausibly allege that PIB processed any transactions—whether through New York or elsewhere—for HLF after it was designated by the U.S. government. Plaintiffs also do not even attempt to identify any causal connection between the one HLF transaction in August 2001 that they allege and any of the attacks in which they were injured.

## B. <u>The District Court Granted PIB's Motion to Dismiss for Lack of Personal Jurisdiction.</u>

Plaintiffs filed this action on January 1, 2019, on the eve of the expiration of an extended statute of limitations for ATA claims. A-105. Plaintiffs asserted claims under multiple provisions of the ATA, as amended by JASTA. SPA-1.

PIB moved to dismiss, and Plaintiffs responded by amending their complaint. PIB then moved to dismiss the amended complaint, both because PIB is not subject to jurisdiction in New York and because Plaintiffs failed to state a claim on which relief can be granted. *Id.* The district court held that PIB is not subject to personal jurisdiction in New York, and granted PIB's motion to dismiss on this ground. *Id.*; *see also* SPA-40-41.

In the lower court, the Plaintiffs argued that they could satisfy the requirements of specific personal jurisdiction because, in three different ways, PIB "transacted in New York, either directly or through an agent, despite having no branch or correspondent account here." SPA-4. As the district court held, each of Plaintiffs' three arguments is wrong, and "personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1)

is lacking because PIB is not alleged to have transacted business in New York in person or through an agent as required for the exercise of long-arm jurisdiction." SPA-40-41.

First, Plaintiffs argued that "AJIB acted as PIB's New York agent in clearing and settling wire transfers from Iraq," and that their claims arise from those New York transactions. SPA-21 (emphasis added). In particular, the Plaintiffs alleged that "the funds transfers" at issue "required sustained, foreseeable action by PIB's 'agent' in New York—the Arab Jordan Investment Bank, or AJIB"—and "the use of" PIB's "Jordanian account" with AJIB "necessitated follow-on actions by AJIB in New York that should satisfy the long-arm statute." SPA-5.

Second, Plaintiffs argued that the PMA "also acted as PIB's agent in New York when it cleared and settled dollar-denominated checks drawn on a PIB account and deposited at another Palestinian bank," SPA-5 (emphasis added), *see also* SPA-21.

Importantly, Plaintiffs did not argue or allege at any time below—not in their pleadings, not in their opposition to the motion to dismiss, and not at oral argument—that the PMA was a "collecting bank" during the relevant time-period, as that term is defined in the Uniform Commercial Code, nor did Plaintiffs otherwise cite N.Y. U.C.C. § 4-201 below or suggest that it "covers clearinghouses like the PMA."

Third, Plaintiffs argued that "the HLF . . . sent funds from its bank account in Richardson, Texas through intermediaries (including AJIB)" to an account at PIB, and that PIB "directed" the flow of funds from HLF "into a New York correspondent

- 12 -

account that AJIB maintained." SPA-5 (emphasis added). As the court noted, "Plaintiffs make no specific allegations about the August 2001 funds transfer being connected to any of the terrorist attacks at issue, nor do they identify any other funds transfers from HLF's account to support terrorist activity." SPA-16.

As the district court correctly held in its October 16, 2020 dismissal decision, Plaintiffs' "agency" theory of jurisdiction under § 302(a)(1) is "foreclosed by Second Circuit precedent: the Court of Appeals has held that '[a] correspondent bank relationship, standing alone, does not create an agency relationship.'" SPA-23 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 122 (2d Cir. 1984)). As the court recognized, "[i]t is on this point that Plaintiffs' jurisdictional claims founder." SPA-23.

The district court also noted that "[t]he Second Circuit has directed that courts focus on the 'realities of the relationship in question rather than the formalities of agency law' when determining whether an agency relationship exists for the purpose of establishing personal jurisdiction under [CPLR] Section 302." *Id.* (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)). But as the court held, "even this practical analysis turns on the elements of the classic agency relationship: that the in-forum intermediary acted (1) for the benefit of, (2) with the knowledge and consent of, and (3) under some degree of control of the non-resident principal." SPA-23. The district court noted that "[c]ourts have found these elements satisfied in circumstances where, for example, the nonresident defendant shared decision-

- 13 -

making authority or joined in a business enterprise with the in-forum intermediary," and that "[c]ourts have also found these elements satisfied where the nonresident defendant played an active role in directing the intermediary's activities relating to the specific in-forum transactions at issue."  SPA-23-24 (citations omitted).

The district court then held:  "That critical element of control is not present in the garden-variety correspondent banking relationship alleged here."  SPA-24 (emphasis added).  As the court explained, this is because "Plaintiffs do not allege . . . that PIB chose the providers of AJIB's two correspondent accounts in New York or exercised any say over which of the two accounts were used for specific transactions."  SPA-25 (citing the declaration of Plaintiffs' expert).  The district court noted that "AJIB used its New York presence to clear and settle the dollar transfers" for PIB, "but Plaintiffs make no non-conclusory allegation that in doing so AJIB acted under the control, or at the direction, of PIB.  PIB may have expected, or even known for a fact, that AJIB would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling."  SPA-26 (emphasis added).

The district court also rejected Plaintiffs' "attempt to invoke PIB's connection with the PMA . . . to show that PIB used a New York 'agent'."  SPA-31.  As the court held, "this attempt founders because the PMA is again alleged to have engaged only in routine check clearing and settlement transactions on behalf of Palestinian banks." *Id.*  Accordingly, Plaintiffs' "allegations of an agency relationship between PIB and

the PMA fall short for the same reasons that the allegations of PIB's relationship with AJIB do – PIB is not alleged to have exercised direction or control over the PMA's contacts with New York." SPA-32.

Finally, the district court found unavailing Plaintiffs' effort to create jurisdiction through the single alleged HLF transaction. The court noted that Plaintiffs alleged that "PIB instructed" HLF "to transfer funds to its PIB account by sending money through the New York forum to" AJIB, PIB's correspondent bank. SPA-34. However, the court correctly held that this could not suffice to establish jurisdiction over PIB, because "PIB did not exercise control over AJIB's selection and use of its correspondent accounts in New York, or AJIB's decision to use correspondent accounts as opposed to another means of clearing and settling U.S. dollar transactions. Nor did PIB exercise control over the decisions of its customers seeking to transfer dollar-denominated funds into their accounts." SPA-37.

Based on the above, and "based on the facts and allegations presented here," the court held that "PIB did not purposefully avail itself of the privilege of conducting activities in New York directly or through an agent during the relevant period." SPA-39. "In sum, PIB's alleged contacts with New York are insufficient to support personal jurisdiction, both individually and in the aggregate." *Id.* Accordingly, the district court granted PIB's motion to dismiss for lack of personal jurisdiction. SPA-41. This appeal followed.

- 15 -

## SUMMARY OF THE ARGUMENT

This Court's prior decisions, including the leading cases *Licci* and *Aaron Ferer*, require affirmance of the district court's decision.

As Plaintiffs acknowledge, PIB had no branches, agencies, or operations in the United States during the relevant time-period. In *Licci*, this Court held that a non-U.S. bank with no physical presence in New York nonetheless can be subject to personal jurisdiction under the long-arm statute, C.P.L.R. § 302(a)(1), if it maintains its own correspondent banking account with a New York bank and uses that account to process the transactions that give rise to plaintiff's claims. However, *Licci* emphasized that foreign banks have choices, and "could have . . . processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts anywhere in the world", and would be subject to U.S. jurisdiction if they "deliberately chose to process . . . wire transfers through [banks] in New York." *Licci IV*, 732 F.3d at 171.

PIB made the deliberate choice, allowed by *Licci IV*, to process its dollar-denominated transactions during the relevant period entirely outside the United States rather than establish and use a correspondent bank account in the United States. PIB thus cannot be subject to personal jurisdiction based on its offshore dollar-denominated transactions, unless *Licci IV* does not mean what it says.

Plaintiffs cannot skirt *Licci IV* by depicting PIB's offshore banking relationships as "agency" relationships that would impute AJIB's and PMA's New York correspondent-banking transactions to PIB. "Importantly . . . , the Complaint

does not allege that AJIB was a member of [a] conspiracy" with PIB (SPA-11), nor does it allege that PIB conspired with its regulator, PMA.  Accordingly, longstanding correspondent-banking principles, rather than co-conspirator tort principles, provide the framework for analysis.

This Court has consistently held that "[a] correspondent bank relationship, standing alone, does not create an agency relationship." *Aaron Ferer*, 731 F.2d at 122; *see Export-Import Bank of the United States v. Asia Pulp & Paper Co.,* 609 F.3d 111, 121 (2d Cir. 2010) (intermediary banks are not "the legal agent of []either the originator [bank] []or the intended beneficiary" bank or customer).  That principle carries over to the terror-financing context, where this Court has applied it to hold that banks in a chain of electronic funds transfers ("EFTs") are not one another's agents.  *Calderon-Cardona v. Bank of N.Y. Mellon,* 770 F.3d 993, 1002 (2d Cir. 2014).  Plaintiffs' misguided effort to depict correspondent banking relationships as "agency" relationships would have the knock-on effect of undoing this Circuit's settled law governing EFTs, both generally and in the terror-financing context.

No agency relationship under C.P.L.R. § 302 can be established absent <u>actual</u> <u>control</u> of the alleged in-forum agent by the out-of-forum principal.  As the district court held, "[t]hat critical element of control is not present in the garden-variety correspondent banking relationship alleged here" between PIB and AJIB.  SPA-24.  Moreover, "PIB is not alleged to have exercised direction or control over the PMA's contacts with New York."  SPA-32.

- 17 -

Plaintiffs also seek to raise an entirely new argument on appeal that, with respect to checks that PIB presented in the PMA's clearinghouse, the PMA acted as a "collecting bank" under the U.C.C., and thus was PIB's "agent." First, this argument is waived and should not be considered by this Court because it was fully available to Plaintiffs but not made below. Second, there is no evidence that the PMA was a "collecting bank" during the relevant period, because there is no evidence that the PMA operated as a bank or that it did, in fact, "collect" checks exchanged by the Palestinian banks during the relevant period. Moreover, even absent waiver, and even if the PMA could be considered a "collecting bank" as to the checks at issue, its actions as a "collecting bank" would have been solely within Palestine, not in the United States, and therefore cannot create jurisdiction over PIB here.

Finally, the district court correctly held that PIB did not transact business in New York under C.P.L.R. § 302 when it received a single wire transfer initiated by HLF through its own bank, BankOne in Texas, which allegedly was routed through AJIB's correspondent bank account at Chase Manhattan Bank. SPA 33-38. First, PIB did not exercise any direction or control over the transaction, either with respect to AJIB's selection of its correspondent accounts in New York or HLF's decision to transfer funds or the means by which it did so. SPA-37-38. Second, the alleged transaction is before the relevant period and before HLF's designation by the U.S. government, and there is no plausibly alleged connection between the transfer and any of Plaintiffs' injuries. *See* A-116-118, ¶¶ 2, 11; A-187, ¶ 574; SPA-14, SPA-16.

- 18 -

# **ARGUMENT**

## I. **Standards of Review**

This Court reviews rulings of law as to personal jurisdiction *de novo*. *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2017) (summary order) (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)). However, where, as here, personal jurisdiction is asserted on the basis of a principal-agency relationship, "[t]he question of whether an agency relationship exists is a mixed question of law and fact." *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir. 2001) (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 385-86 (2d Cir. 1994)). The district court's "factual holdings" in assessing the existence of an agency relationship are thus reviewed "for clear error." *See Mario Valente*, 264 F.3d at 36 (citing *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co. Ltd.*, 241 F.3d 135, 151 (2d Cir. 2001)); *accord Licci v. Lebanese Canadian Bank, SAL ("Licci II"),* 673 F.3d 50, 59 (2d Cir. 2012) ("factual findings regarding personal jurisdiction" are reviewed "for clear error") (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004)). For example, the district court's determination as to whether an alleged principal (here, PIB) has "exercised some control" over an alleged agent (here, AJIB or the PMA) is a factual holding subject to review under the clearly erroneous standard. *See Mario Valente*, 264 F.3d at 36. "Clear error is present when, 'upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed.'" *Joint Stock*

*Co. v. Infomir LLC*, No. 16 Civ. 1318, 2018 U.S. Dist. LEXIS 167773, at *4 (S.D.N.Y. Sep. 28, 2018) (quoting *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (brackets in original)).

"'In order to survive a motion to dismiss for lack of personal jurisdiction, the plaintiffs must make a prima facie showing that jurisdiction exists.'" *Licci II*, 673 F.3d at 59 (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (internal alterations omitted). "This prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *Licci II*, 673 F.3d at 59 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). In resolving a Rule 12(b)(2) motion, the Court "may consider materials outside the pleadings," including affidavits submitted by the defendant. *See Trisvan v. Heyman*, 305 F. Supp. 3d 381, 391 (E.D.N.Y. 2018); *Reliance First Capital, LLC v. Mid Am. Mortg., Inc.*, No. 18-cv-3528, 2019 U.S. Dist. LEXIS 100901, at *2, 17 (E.D.N.Y. June 17, 2019). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (internal quotation and citation omitted) (emphasis added). "[W]hen a defendant rebuts plaintiffs' unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiffs do not counter that evidence—the allegation may be deemed refuted." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 228 (S.D.N.Y. 2015)

(internal quotation and citation omitted); *Reliance First Capital*, 2019 U.S. Dist. LEXIS 100901, at *17 (internal quotation and citation omitted).

## II. Under *Licci*, a Foreign Bank is Subject to Jurisdiction in New York Only if it Maintains and Uses Its Own Correspondent Account Here.

In *Licci IV*, this Court held that a foreign bank with no branches or operations in the U.S. can be subject to personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. 302(a)(1), if that bank maintains its own U.S. correspondent account and uses that account to process the transactions which give rise to the plaintiff's claims. The underlying principle is that foreign banks "could have . . . processed dollar-denominated transfers . . . through correspondent accounts anywhere in the world", and should be subject to U.S. jurisdiction if they "deliberately chose to process . . . wire transfers through [banks] in New York." *Licci IV*, 732 F.3d at 171. PIB, however, made the other deliberate choice that *Licci* allows—to handle its dollar-denominated transactions entirely outside the United States—and thus cannot be subject to personal jurisdiction without eviscerating *Licci IV*.

The defendant in *Licci*, Lebanese Canadian Bank ("LCB"), was "a Lebanese bank with no operations, branches, or employees in the United States." *Licci IV*, 732 F.3d at 165. However, unlike PIB here, LCB "maintain[ed] a correspondent bank account . . . in New York," and the *Licci* plaintiffs alleged that "LCB executed wire transfers" at issue "using its correspondent account in New York," *id.* at 165-66. Thus, the *Licci* plaintiffs alleged that LCB was subject to specific personal

- 21 -

jurisdiction in New York based on its use of <u>its own</u> correspondent account at a New York bank to process transfers that were causally related to the attacks at issue in that case.

This Court certified to the New York Court of Appeals the question whether "a foreign bank's <u>maintenance</u> of a correspondent bank account at a financial institution in New York, and use of <u>that account</u>" to process the transactions at issue, could give rise to personal jurisdiction under C.P.L.R. § 302(a)(1). *Licci IV*, 732 F.3d at 167 (emphasis added). The Court of Appeals answered in the affirmative, *Licci v. Lebanese Can. Bank, SAL* ("*Licci III*"), 20 N.Y.3d 327, 341 (N.Y. 2012).

As this Court recognized in *Licci IV*, the Court of Appeals "found both the frequency and deliberate nature of LCB's use of <u>its correspondent account</u> to be determinative" in satisfying § 302(a)(1), and that the allegations that "LCB used <u>its New York correspondent account</u> 'dozens' of times" indicated "desirability and a lack of coincidence" and thus "reflects LCB's purposeful availment of the privilege of doing business in the New York forum." *Licci IV*, 732 F.3d at 168 (emphasis added). This Court also found it important that LCB allegedly "violated various statutory duties by using <u>its correspondent account</u> to funnel money" through New York. *Id.* at 169 (emphasis added). Additionally, this Court held that "the selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress," was central to the "subjecting of LCB to specific jurisdiction . . . consistent with due process

- 22 -

requirements." *Id.* at 171; *see Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due process, the <u>defendant's suit-related conduct</u> must create a substantial connection with the forum State.") (emphasis added).

Plaintiffs muddle the *Licci* requirements by arguing that "*ownership* of an account in New York is not necessary under *Licci* or any other Second Circuit or New York case law." Brief for Plaintiffs-Appellants ("BPA") at 42. This argument ignores this Court's repeated references in multiple *Licci* decisions, as well as in the very questions this Court certified to the New York Court of Appeals, to LCB's "use of <u>its</u> correspondent account," as well as LCB's "maintenance of" a New York correspondent account and "use of <u>that account</u>," *Licci IV*, 732 F.3d at 167 (emphasis added).

Similarly, Plaintiffs appear to argue that because both *Aaron Ferer* and *Licci* cite to *Amigo Foods Corp. v. Marine Midland Bank-N.Y.,* 39 N.Y.2d 391 (1976), this Court's finding that "the defendant's use of" an in-forum correspondent account can support jurisdiction somehow could apply to PIB, even though PIB neither had nor used its own New York correspondent account during the relevant period. (BPA at 58.) To the contrary, in *Licci* this Court found LCB subject to jurisdiction based specifically on maintenance and use of <u>its own</u> correspondent account in New York.

The holdings of this Court and the New York Court of Appeals that LCB was subject to personal jurisdiction in New York were based explicitly on LCB's choice

- 23 -

to maintain and use its own correspondent account in New York, rather than to facilitate its dollar-denominated business through channels outside the United States. As this Court recognized, "[i]n light of the widespread acceptance and availability of U.S. currency, LCB <u>could have</u> . . . processed U.S.-dollar-denominated wire transfers . . . through <u>correspondent accounts anywhere in the world</u>"—but that instead, "LCB <u>deliberately chose</u> to process the . . . wire transfers through <u>AmEx in New York</u>." *Licci IV*, 732 F.3d at 171 (emphasis added).  Similarly, the New York Court of Appeals noted that "LCB could have routed the dollar transactions . . . elsewhere," but chose to process them through its own New York correspondent account, because "[p]resumably, using the AmEx account was cheaper and easier for LCB than other options". *Licci III*, 20 N.Y.3d at 340.  For that reason, LCB's "in-forum activity sufficiently reflect[ed] [its] 'purposeful availment' of the privilege of carrying on its activities" in New York.  *Licci IV*, 732 F.3d at 173 (citation omitted).

In other words, this Court held that LCB was subject to jurisdiction in New York because it <u>deliberately chose</u> to process the transfers at issue through its own correspondent account with a New York bank.  Indeed, "deliberate choice" and "purposeful availment" are essentially synonyms.  On the other hand, under the *Licci* framework, if LCB had chosen to route the transfers through "correspondent accounts anywhere in the world" <u>outside</u> the U.S., then it would <u>not</u> have been subject to jurisdiction in New York.  *See also Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) ("Underlying Plaintiffs' argument is the faulty assumption that

- 24 -

U.S. dollars can only be obtained in the United States. . . . [G]iven the worldwide availability of U.S. currency, it does not follow that New York (or even the United States) is essential to the provision of said currency.").

Here, PIB made precisely the choice allowed by *Licci*: throughout the relevant time-period, PIB chose to conduct its dollar-denominated banking activity through "correspondent accounts anywhere in the world" outside the United States— primarily through its correspondent account with AJIB in Amman, Jordan. PIB did not even <u>have</u> a correspondent account in the U.S. during the relevant period, or at any time prior to 2009. PIB thus falls squarely within the exemption from personal jurisdiction recognized by *Licci*.

Entirely contradicting *Licci*, Plaintiffs take the stunning position that jurisdiction exists over any bank anywhere in the world that transacts in dollars because all dollar-denominated transactions ultimately are settled on an <u>aggregate</u> (or "wholesale") basis using U.S.-based banking platforms (CHIPS and Fedwire). BPA at 16-17. Plaintiffs' misguided theory would require this Court to disavow the premise of *Licci IV* and hold it irrelevant that PIB made the deliberate choice to process dollar transactions "anywhere in the world" outside the United States. Ultimately, Plaintiffs' position is that U.S. jurisdiction follows the U.S. dollar, and that foreign banks are always subject to jurisdiction unless they "refus[e] to offer dollar-denominated accounts" altogether. BPA at 60.

Jurisdictional imperialism based on dollar-denominated transactions is not the law, and would contradict *Licci IV*. Instead, *Licci IV* focused on whether a foreign bank "purposefully availed" itself of the U.S. banking system and "the privilege of doing business in the New York forum" by deliberately choosing to route dollar transfers through its own correspondent account in the United States, when it had the option to process those transactions outside the United States. Here, PIB chose to, and did, process its dollar-denominated transactions outside the United States. PIB did not benefit from the U.S. banking system simply by engaging in offshore dollar-denominated transactions.

Plaintiffs' theory would nullify the deliberate-choice principle underpinning *Licci IV*, and replace it with universal personal jurisdiction that "follows the dollar." No court has ever accepted that theory, which not only contradicts *Licci IV*, but also would violate due process principles requiring a purposeful connection to the U.S. established by actions of the defendant itself rather than third-parties. *See Waldman v. PLO*, 835 F.3d 317, 335 (2d Cir. 2016). Jurisdiction that merely follows the dollar also would disrupt settled international banking practices, which depend on clear definitions of the rights and responsibilities of banks engaged in EFTs. *See generally* Brief of *Amici Curiae* the European Banking Federation and the Institute of International Bankers, ECF No. 141 in *Bartlett v. Société Générale de Banque au Liban SAL,* 19-cv-00007 (E.D.N.Y.) (filed Feb. 3, 2020), at 6 ("Providing banking

services to customers engaging in legitimate transactions . . . is especially vital to the functioning of the global financial system and international finance and trade.").

## III. AJIB Did Not Act as PIB's "Agent" for Purposes of Personal Jurisdiction by Maintaining a Correspondent Banking Relationship with PIB Outside the United States.

As the district court recognized, PIB's dollar-denominated correspondent account with AJIB in Amman, Jordan cannot subject PIB to specific personal jurisdiction in New York because, unlike LCB in *Licci*, PIB did not conduct suit-related transactions through a correspondent account it maintained at a U.S. bank. Instead, PIB fits into the exception recognized in *Licci*—it opted to conduct its dollar-denominated business entirely outside the United States through a correspondent account at a non-U.S. bank—through its "garden-variety correspondent banking relationship" with AJIB. SPA-24. .

Attempting to skirt the *Licci* exception, Plaintiffs contend that because PIB maintained a correspondent bank account outside the United States with AJIB, and AJIB in turn maintained its own correspondent bank accounts in the United States, AJIB was an "agent" of PIB with respect to any transactions PIB sent to AJIB that AJIB then routed to or through a bank in the United States.

As the district court correctly held, however, Plaintiffs' argument that AJIB was PIB's "agent" is "foreclosed by Second Circuit precedent," SPA-23, because this Court has explicitly held that "[a] correspondent bank relationship, standing alone, does not create an agency relationship." *Aaron Ferer,* 731 F.2d at 122; *see also*

- 27 -

*Calderon-Cardona,* 770 F.3d at 1002. Multiple other courts have held similarly. *See, e.g.*, *Butto v. Collecto Inc.*, 845 F. Supp. 2d 491, 497 (E.D.N.Y. Feb. 23, 2012) (defendant's "role of temporarily holding funds is similar to that of a bank, in which such a relationship, standing alone, does not create an agency relationship.") (citing *Aaron Ferer*, 731 F.2d at 122); *Hawthorne v. Am. Mortg., Inc.*, 489 F. Supp. 2d 480, 485 (E.D. Pa. 2007) (mortgage broker's "status as a correspondent bank shows that it was independent from [mortgage lender]—not controlled by it—and thus was not its agent"); *Banco Urquijo, S.A. v. Signet Bank*, 861 F. Supp. 1220, 1249 (M.D. Pa. 1994) ("Correspondent banking relationships do not give rise to fiduciary duties."); *Wells Fargo Bank, N.A. v. Citizens Bank of Tex., N.A.*, 181 S.W.3d 790, 801 (Tex. App. 2005) (surveying cases and finding that "the weight of authority seems to be that '[a] correspondent bank relationship, standing alone, does not create an agency relationship'"). Correspondent banks are therefore not "the legal agent of []either the originator [bank] []or the intended beneficiary" bank or customer, *Export-Import Bank*, 609 F.3d at 121. As the district court properly held, "[i]t is on this point that Plaintiffs' jurisdictional claims founder." SPA-23. This black-letter law alone defeats Plaintiffs' argument and requires affirmance.[2]

---

[2] The cases Plaintiffs cite for the opposite proposition—that "when processing a payment on a customer's instructions, correspondent banks act as their customers' agents," BPA at 47, are unavailing. In *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 344, 357 (2d Cir. 1992), a Swiss Bank, Mebco, repeatedly wired funds to its account at the New York branch of Swiss Bank Corporation ("Swiss Bank-NY") and instructed Swiss Bank-NY to send the funds to another New York bank to

This Court has recognized in the ATA context that "the <u>defendants' suit-related conduct—their role</u> in the . . . terror attacks at issue"—*i.e.,* "the conduct that could have subjected" the defendant "to liability under the ATA"—is the only conduct relevant to establishing specific personal jurisdiction. *Waldman,* 835 F.3d at 335 (emphasis added); *see Walden,* 571 U.S. at 284 (relevant contacts with the forum are "contacts that the 'defendant *himself*' creates with the forum State.") (emphasis in original) (citation omitted). Here, PIB's own conduct did not create a connection to the forum.

Instead, during the relevant time-period, all of PIB's dollar-denominated transfers outside Palestine were accomplished offshore by way of book-to-book transfers, primarily with AJIB in Jordan. A-211-12, ¶¶ 15-16, 23-26. PIB never controlled how AJIB processed transfers to or through the United States. "Rather,

---

facilitate Mebco's currency exchange transactions. Swiss Bank-NY thus was considered to have "performed agency functions" for Mebco in its role facilitating Mebco's own transactions as Swiss Bank-NY's depositor, not as a correspondent. *Delbrueck & Co. v. Mfr. Hanover Trust Co.*, 609 F.2d 1047, 1049, 1051-52 (2d Cir. 1979) similarly found New York banks to be "paying and receiving" agents of their foreign bank customers regarding those foreign banks' <u>own</u> foreign exchange contracts. These cases were not based on correspondent banking transactions, and certainly not based on the "garden-variety correspondent banking relationship alleged here." SPA-24. Indeed, the word "correspondent" does not appear in the *Koreag* or *Delbrueck* opinions. And the out-of-circuit case *Sec. Fund Servs., Inc. v. Am. Nat'l Bank & Tr. Co.*, 542 F. Supp. 323, 327 (N.D. Ill. 1982), found that a correspondent bank "may be presumed to be an agent" not of the other correspondent bank (as Plaintiffs suggest here between PIB and AJIB), but of "<u>the initiator</u> of the transaction," *i.e.* the originating customer. 542 F. Supp. at 327 (emphasis added). That conclusion is both inapposite and directly at odds with this Court's more recent holding in *Export-Import Bank*.

AJIB made its own decisions about whether it would use its own U.S. correspondent banks, and who those correspondents would be." A-213, ¶ 29.

These facts make clear that an agency relationship did not exist between PIB and AJIB given the "realities of the relationship in question." *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 366 (2d Cir. 1986) ("In determining whether an agency exists under § 302, courts have focused on the realities of the relationship in question rather than the formalities of agency law.") (citations omitted). The district court accordingly undertook a "practical analysis" focused "on the elements of the classic agency relationship: that the in-forum intermediary acted (1) for the benefit of, (2) with the knowledge and consent of, and (3) under some degree of control of the non-resident principal." SPA-23 (citing *Cutco Indus.*, 806 F.2d at 366) (emphasis added).

After weighing the evidence, the district court correctly found that the "critical element of control is not present in the garden-variety correspondent banking relationship alleged here" between PIB and AJIB. SPA-24. That finding is entitled to deference under a clearly erroneous standard of review. *See Mario Valente*, 264 F.3d at 36 (in the context of assessing personal jurisdiction under C.P.L.R. § 302(a), "[t]he question of whether an agency relationship exists is a mixed question of law and fact," and the district court's decision as to the whether an alleged principal has "exercised some control" over the alleged agent may be reversed only for clear error) (internal quotation and citations omitted).

- 30 -

The district court's decision is correct under any standard of review. Second Circuit law is clear that, "to establish an agency relationship for jurisdictional purposes," a showing of actual control by the nonresident principal over the alleged in-forum agent is required. *Hau Yin To*, 700 F. App'x at 68. It is not enough to show that the alleged nonresident principal had the legal <u>ability</u> to control the alleged agent (which Plaintiffs have not even alleged); instead, under C.P.L.R. § 302(a), Plaintiffs must show "<u>the actual exercise of control</u>, based on 'the realities of the relationship'". *Id.* (quoting *CutCo Indus.*, 806 F.2d at 366 (emphasis added)).

Applying that framework, the district court found as a factual matter that PIB did not direct or control AJIB's decisions about how AJIB selected or used its own correspondent banks (whether in or outside the United States), how AJIB cleared dollar-denominated transactions, or how AJIB processed funds to or through the United States. Plaintiffs do not, and could not, allege that PIB chose the providers of AJIB's two correspondent accounts in New York or exercised any say over which of the two accounts were used for specific transactions. *See, e.g.,* A-223-24, ¶¶ 33, 37.

As the district court found, the correspondent-banking relationship between PIB and AJIB is "analogous to the functions performed by banks in a chain of electronic-funds transfers (*i.e.,* wire transfers, or EFTs)—functions that the Second Circuit has held do not give rise to an agency relationship." SPA-26 (citing *Export-Import Bank*, 609 F.3d at 121 (an intermediary bank that processes EFTs is not the "legal agent" of either the originator or the intended beneficiary of the funds transfer

- 31 -

under Article 4 of the New York Uniform Commercial Code)).  Applying U.C.C.

Article 4 in terrorism cases involving banks, this Court has held that intermediary

banks in New York that process EFTs for overseas banks (like PIB or, indeed, AJIB)

are independent actors, not agents of the overseas banks that initiate or receive funds

processed through U.S. banks.  *See Calderon-Cardona,* 770 F.3d at 1001 (holding

that "under New York law 'EFTs are neither the property of the originator nor the

beneficiary while briefly in the possession of an intermediary bank.'") (citation

omitted).  Plaintiffs' position would upset existing law and settled expectations in the

global banking community regarding the critical question of what party owns

electronic funds at various points in the transfer chain.

Plaintiffs now argue that U.C.C. § 4-A "does not generally govern the

relationship between two foreign banks," BPA at 64 (citing *Wellton Int'l Express v.*

*Bank of China (Hong Kong)*, No. 19-cv-6834, 2020 U.S. Dist. LEXIS 59224, 2020

WL 1659889, at *4 (S.D.N.Y. Apr. 3, 2020)).  Plaintiffs are wrong because, first, the

district court merely found PIB's correspondent relationship with AJIB to be

"analogous" to banks in an EFT chain as additional support for its conclusion that

AJIB was not PIB's agent, SPA-26 (emphasis added).  Second, the *Wellton* court did

apply § 4-A's definitions to the foreign parties in the case, *see id*, 2020 U.S. Dist.

LEXIS 59224, at *5 (finding that, under § 4-A-104, plaintiff was "both the sender

and the originator in this case" and Bank of China was "the originator's bank"), but

found that the law of Hong Kong applied to the plaintiffs' claims against Bank of

China because, under § 4-A, "the rights and obligations between the sender of a payment order and the receiving bank are governed by the law of the jurisdiction where the receiving bank is located." *Wellton*, 2020 U.S. Dist. LEXIS 59224, at *9. Of course, Plaintiffs here have not suggested that their claims should be governed by the law of any jurisdiction other than New York and the United States—and, indeed, have argued incorrectly, inconsistently, and for the first time on appeal, that other U.C.C. provisions should apply to the relationship between PIB and the PMA.

Plaintiffs also argue that by establishing a correspondent relationship with AJIB, PIB "bought in" to AJIB's decisions to use correspondent banks in New York. *See* BPA at 59-61 (citing *National Union Fire Ins. Co. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352, 361 (S.D.N.Y. 2004)). But even if this is true, all it means is that PIB would send transfers to AJIB—in Amman, Jordan—and AJIB would send them elsewhere, and that AJIB would receive transfers—in Amman, Jordan—and then send them to PIB. As the district court recognized, "Plaintiffs make no non-conclusory allegation that in doing so AJIB acted under the control, or at the direction, of PIB. PIB may have expected, or even known for a fact, that AJIB would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling." SPA-26 (emphasis added).

As the district court also held, the relationship between PIB and AJIB is qualitatively different than the one in *National Union*, which stands for the uncontroversial principle that a party cannot avoid jurisdiction under § 302(a)(1) by

- 33 -

doing indirectly—through an agent—that which would plainly give rise to jurisdiction if the party did so directly. SPA-27-28; *National Union*, 319 F. Supp. 2d at 361-63. The passage Plaintiffs highlight from *National Union* (BPA at 52) explains the principle:

> If X transacts business in New York, then X will be subject to personal jurisdiction on a cause of action arising out of that transaction. If X instead hires Y to transact the same business in New York, and Y's contacts with New York relative to that transaction would suffice to confer on a New York court personal jurisdiction over Y, then X will also be subject to personal jurisdiction on a cause of action arising out of that transaction.

319 F. Supp. 2d at 363.

As the district court pointed out, the intermediary in *National Union* was a "classic agent—an insurance broker engaged to obtain insurance policies and negotiate coverage terms on behalf of its principal and various subsidiaries." SPA-28. And the

> important distinction between *National Union* and this case is memorialized in the above-quoted passage itself, in the phrase '*X hires*.' The use of 'hires' implies the existence of a principal-agent relationship, perhaps in the nature of employer-employee. As alleged, no such relationship existed between PIB and AJIB or between PIB and the PMA.

*Id.* For similar reasons, Plaintiffs' citations to *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12-cv-9258, 2014 U.S. Dist. LEXIS 45891, 2014 WL 1331046 (S.D.N.Y. Mar. 31, 2014), and *Matter of Bennett Funding Group, Inc.*, 336 F.3d 94 (2d Cir. 2003), are unavailing. In *Bidonthecity.com*, the court found that that a

subsidiary had acted as agent for its parent in negotiating a joint venture agreement. And in *Matter of Bennett Funding Group*, this Court found an agency relationship where an alleged fraudster, Patrick Bennett, was CFO of the Bennett Funding Group ("BFG"); other Bennett family members were BFG's President, Chairman and CEO, and sole shareholders; and "the Bennett family was in control of every aspect of every activity within the BFG empire, including the fraud, from the get-go." 336 F.3d at 97, 101. Nothing remotely similar is alleged with respect to the relationship between PIB and AJIB.

Plaintiffs made a belated claim at oral argument that an agency relationship between PIB and AJIB could be based on Plaintiffs' allegations of conspiracy. SPA-30; A-329. While co-conspirators may be considered agents for one another for jurisdictional purposes, *see Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012), the district court correctly rejected that premise here because Plaintiffs did not allege that AJIB was PIB's co-conspirator. SPA-11, 30-31. Moreover, Plaintiffs did not renew this argument in their opening brief and have therefore abandoned it on appeal. *See JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief.").

To support their assertion that "PIB instructed AJIB to process each relevant transaction in New York," Plaintiffs misleadingly cherry-pick partial quotes from

- 35 -

PIB's supporting declarations. *See* BPA at 24, 59. The full paragraphs from those documents make clear that "[t]o the extent PIB instructed AJIB to process a payment to a U.S. bank or bank account, such instruction simply implemented decisions made independently by, and at the express direction of, the PMA, PIB's customer, or the counterparty to the transaction, not by PIB and not as a result of any arrangement or relationship PIB had with any U.S. bank." A-213, ¶ 29; *see also id.*, ¶ 27 ("In the event that the PMA, another bank, or a customer of PIB instructed PIB to transfer funds to an account at a U.S. bank, PIB would send a transfer to its correspondent bank, AJIB, and request AJIB to transfer the funds on to the U.S. bank."). PIB's declarant further stated, and Plaintiffs have not disputed, that PIB's instructions to AJIB to send transfers to settle the results of clearing activity to the PMA's account at Arab Bank-Ramallah through a correspondent account at Arab Bank-New York were "required by the PMA," and that "PIB did not direct AJIB to use any of AJIB's U.S. correspondent banks to send those" transfers to Arab Bank-New York. A-251, ¶ 30.

Plaintiffs also incorrectly seek to cast suspicion on the very nature of PIB's correspondent account with AJIB. Plaintiffs note that the account is considered a "nested" correspondent account. BPA at 4. "Nested," or "downstream," correspondent banking is a common practice in international banking whereby "a respondent bank provides downstream correspondent services to other financial institutions and processes these transactions through its own correspondent account."

A-249, ¶ 12 (quoting "Nesting," AML Glossary of Terms, Association of Certified Anti-Money Laundering Specialists). Nesting is "a normal part of correspondent banking." *Id.*; *see also* Basel Committee on Banking Supervision, "Guidelines: Sound management of risks related to money laundering and financing of terrorism," January 2014 (rev. July 2020), at 27 ("nested" correspondent banking relationships remain "an integral and generally legitimate part of correspondent banking.").[3] According to the Society for Worldwide Interbank Financial Telecommunications ("SWIFT"), "[o]ne in five payments on SWIFT is nested, with banks sending messages on behalf of other institutions in other countries." SWIFT, "Leverage your SWIFT data for global correspondent banking transparency," 27 June 2018.[4] Nested correspondent accounts are particularly important for smaller banks and banks in developing economies, as they may be unable to establish direct correspondent relationships. *See* Standard Chartered, "How correspondent banking can manage payment transparency, nesting and fintech risks," Nov. 26, 2020 ("Nesting can expand financial inclusion, for instance to the customers of small [financial institutions] in emerging markets that lack correspondent relationships of their own. It reduces costs, increases economy of scale, and provides a better picture of

---

[3] https://www.bis.org/bcbs/publ/d505.pdf (last visited May 27, 2021).
[4] https://www.swift.com/news-events/news/leverage-your-swift-data-global-correspondent-banking-transparency (last visited May 27, 2021).

payments being taken out of the market.").[5]

Although Plaintiffs acknowledge, as they must, that "nested" correspondent banking is a "common practice in international banking" (BPA at 21, citing A-249, ¶ 12), they attempt nonetheless to smear nested accounts with unfounded insinuations of "money laundering and financing-of-terrorism" concerns, and in fact go so far as to call nested correspondent banking a "money laundering technique." BPA at 8, 21. While that characterization defies common acceptance of nested accounts, it cannot govern the C.P.L.R. § 302 question of whether a nested account creates an agency relationship, or upset the district court's finding that AJIB was not PIB's agent. Further, governments and banks have abundant alternative ways to address money-laundering risks that do not require rewriting the rules of correspondent banking or upsetting settled Circuit precedent that correspondent banks are not agents for one another.

In sum, as the evidence below established, PIB did not direct or control how AJIB used its own U.S. correspondent banks to process whatever dollar-denominated transactions may have followed from the offshore AJIB-PIB transactions. PIB did not control with which banks AJIB had correspondent relationships or which AJIB chose to use for particular transactions, and AJIB was free to reject the transactions or the correspondent relationship altogether. A-249-51. Given this undisputed

---

[5] https://www.sc.com/en/feature/how-correspondent-banking-can-manage-payment-transparency-nesting-and-fintech-risks/ (last visited May 27, 2021).

evidence, the district court correctly determined that Plaintiffs' "conclusory allegations do not suffice," and that "AJIB used its New York presence to clear and settle the dollar transfers, but Plaintiffs make no non-conclusory allegation that in doing so AJIB acted under the control, or at the direction, of PIB. PIB may have expected, or even known for a fact, that AJIB would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling." SPA-26-27. That determination was not clearly erroneous. Accordingly, AJIB did not act as PIB's agent, including with respect to any of the transactions at issue, and AJIB's U.S. correspondent-banking activity cannot support specific personal jurisdiction over PIB.

## IV.  The PMA Was Not PIB's "Agent" for Purposes of the Long-Arm Statute.

The district court likewise correctly found no factual support for Plaintiffs' contention that the Palestinian bank regulatory authority, the PMA, "acted as PIB's agent in New York when it cleared and settled dollar-denominated checks drawn on a PIB account and deposited at another Palestinian bank". SPA-5. During the relevant period, all Palestinian banks, including PIB, were required to participate in the PMA's system for clearing and settling transactions between Palestinian banks, including checks, inter-bank transfers, and personal money transfers. A-211, ¶ 10. As alleged, dollar-denominated checks drawn on PIB accounts and deposited at other Palestinian banks, including some of the checks at issue, were "settled in the United States via the PMA." SPA-11.

- 39 -

Through the PMA's clearing system, dollar-denominated transactions among Palestinian commercial banks (like PIB) were set off against one another on a daily basis, leaving each bank with either a net credit owed to it from the other banks, or a net debt owed to the other banks, depending on that day's transactional activity. A-211, ¶ 19. If a bank owed a net debt to other banks, then it was required to settle that debt by transferring funds in dollars to the account the PMA had designated for this purpose. *Id.* During the relevant period, the PMA required the banks to send these transfers to the PMA's account at Arab Bank in Ramallah, through the PMA's correspondent bank account with Arab Bank in New York. A-211-212; SPA-11-12. Plaintiffs baselessly alleged that "the PMA acted as an agent for Palestinian banks, including PIB, by settling their U.S. dollar-denominated transactions in New York," which Plaintiffs alleged "constitutes purposeful availment of the New York forum" by PIB. SPA-21.

The district court correctly held that "[t]hese contentions . . . are foreclosed by Second Circuit precedent" in *Aaron Ferer* (SPA-23), recognizing that "the PMA is . . . alleged to have engaged only in routine check clearing and settlement transactions on behalf of Palestinian banks." SPA-31. Accordingly, Plaintiffs' "allegations of an agency relationship between PIB and the PMA fall short for the same reasons that the allegations of PIB's relationship with AJIB do – PIB is not alleged to have exercised direction or control over the PMA's contacts with New York." SPA-32. Indeed, the PMA, PIB's bank regulator, required all banks operating in Palestine to

participate in its payments system, including making and receiving settlement payments according to the PMA's instructions.  PIB had no direction or control over the system and no choice as to whether to participate.  PIB also had no involvement in the PMA's designation of an account at Arab Bank-Ramallah for receiving settlement transfers or the PMA's instruction to route those transfers through the PMA's correspondent account at Arab Bank-New York.  A-212, ¶ 21.[6]  The PMA, therefore, did not act as PIB's agent in New York, and the PMA's decision to maintain a correspondent bank account with a bank in New York cannot establish personal jurisdiction over PIB in New York.

Having lost on this issue below, Plaintiffs now argue for the first time on appeal that the PMA acted as PIB's "formal agent" by serving as "the collecting bank for PIB's checks."  Plaintiffs did not argue below that the PMA is a "collecting bank" as defined in the Uniform Commercial Code.  Plaintiffs have thus waived their "collecting bank" argument, which is in any case legally and factually groundless.

"The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below . . . waiver will bar

---

[6]  As the district court recognized, the undisputed fact that the PMA, and not PIB, designated a correspondent bank in New York to process settlement transfers distinguishes this case from "the facts that led to a finding of purposeful availment in *Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56 (S.D.N.Y. 2016)."  SPA-25; *see* SPA-29 (noting that "the district court in *Arcapita* found the exercise of personal jurisdiction over defendant Tadhamon proper because it had specifically designated a New York bank account to receive and transfer funds for the investment transaction that was the subject of the complaint.").

raising the issue on appeal." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005) (quoting *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977); *see In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (per curiam) ("'[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal.'") (quoting *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006)); *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015). This Court has expressed particular disdain for considering "new arguments on appeal where those arguments were available to the [parties] below and they proffer no reason for their failure to raise the arguments below." *Bogle-Assegai*, 470 F.3d at 504 (internal quotations and citation omitted); *see Anderson Grp.*, 805 F.3d at 50 (court finding "no reason to" "consider waived arguments" where party "has offered no explanation for its failure to present to the district court the new . . . arguments it now advances on appeal").

Here, Plaintiffs attempt to advance for the first time an argument that the PMA, by operating a clearinghouse for Palestinian banks, was a "collecting bank" for those banks, and thus an "agent" for the banks. BPA at 29, 33, 53-55. This argument was fully available to Plaintiffs in the district court, but was not made there, and Plaintiffs have proffered no explanation for their failure to do so. They have therefore waived this argument.

Even if Plaintiffs' "collecting bank" argument were not waived, it would fail for other reasons. First, there is no record evidence that, during the 2001-2003 time-

period relevant to this action, the PMA met the U.C.C. definition of a "collecting bank." U.C.C. § 4-105(5) defines "Collecting bank" as "a <u>bank</u> handling an item for collection except the payor bank." (emphasis added). The same section defines "Bank" as "a person engaged in the business of banking, including a savings bank, savings and loan association, credit union, or trust company." U.C.C. 4-105(1).

Here, there is no record evidence, and Plaintiffs have not plausibly alleged, that during the relevant period, the PMA was "engaged in the business of banking." Rather, the record reflects that the PMA was the "<u>regulatory authority for</u> all banks in Palestine." A-210, ¶ 9 (emphasis added). There is no allegation that the PMA was licensed as a bank in Palestine during the relevant period, or that it would have been lawful for the PMA to operate as a bank without such a license. Plaintiffs themselves state in their pleading that "the PMA does not issue its own banknotes or act as a lender of last resort for any of the currencies used by Palestinian banks" and that "the PMA does not have a monetary policy in the sense of controlling interest rates or exchange rates". A-120. Moreover, during the relevant period, the PMA designated an account it maintained at Arab Bank in Ramallah, Palestine, for settling the net credits and debits resulting from the PMA's system for clearing checks and other transactions between Palestinian banks. A-211-212. Presumably, if the PMA were "engaged in the business of banking," it would have been much simpler to designate an account on <u>its own</u> books for that purpose.

- 43 -

It is Plaintiffs' burden to make a showing sufficient to establish personal jurisdiction. *Licci II*, 673 F.3d at 61. Plaintiffs have not done so with respect to their newly-asserted "PMA as collecting bank" theory. Plaintiffs have not put forth a sufficient showing that the PMA was "engaged in the business of banking" during the relevant period. And if the PMA was not a "bank," then it cannot have been a "collecting bank" under § 4-105.

Plaintiffs also assert in conclusory and fact-free fashion that N.Y. U.C.C. § 4-201(1) "covers clearinghouses like the PMA." BPA at 54. But Plaintiffs cite no authority for this proposition, and there are no facts in the record supporting Plaintiffs' new claim. The reason for this lack of factual development is obvious— because Plaintiffs never presented their "collecting bank" argument in the district court, and thus there was no need for either party or the district court to address it.

Plaintiffs cite one case in which this Court held that the Federal Reserve Bank of New York is a "collecting bank" under N.Y. U.C.C. § 4-201. BPA at 55 (citing *Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 45 (2d Cir. 1989). Plaintiffs then argue that the PMA's clearinghouse should be similarly treated. But *Greater Buffalo Press* relates to the Federal Reserve Bank's role in the "check collection process," as more recently described by this Court in *Thompson v. First BankAmericano*, 518 F.3d 128, 131, 142 (2d Cir. 2008), and illustrated in the Appendix to that decision. In that process, a depository bank will "send the check to the Federal Reserve Bank for its district," and the Federal Reserve Bank "will then

- 44 -

present the check to the payor bank." *Greater Buffalo Press*, 866 F.2d at 40. In this process, the Federal Reserve System is responsible for "effecting the physical delivery of the check" to the payor bank. *Id.*

Here, there is no evidence that the PMA's payment system operated in any way similar to the Fed's check-collection process described in *Greater Buffalo Press* or *Thompson*, or that the PMA provided any similar "check collection" service for PIB or other Palestinian banks during the relevant period. Rather, as explained in an IMF report, "The PMA administers the clearinghouse, <u>supervises</u> the organization of exchange of payment transactions <u>among banks</u>, determines the balance arising from such operations, and settles the result." Alonso-Gamo, Patricia *et al*., "West Bank and Gaza Strip: Economic Developments in the Five Years Since Oslo," International Monetary Fund 1999, at 33 (emphasis added).[7] Moreover, unlike the Federal Reserve System in *Greater Buffalo*, rather than the Palestinian banks sending checks to the PMA and then the PMA presenting those checks to the payor banks for payment, the various "[b]ank representatives" from the various Palestinian banks "<u>meet</u> every day at clearing rooms in Gaza and Ramallah <u>to clear checks and transfers</u>." *Id.* (emphasis added). Put simply, there is no evidence or plausible allegation in the record that the PMA ever actually "collected" the checks at issue from PIB, or that the PMA was responsible for "effecting the physical delivery of the

---

[7] https://www.elibrary.imf.org/view/books/071/07871-9781557758279-en/07871-9781557758279-en-book.xml (last visited May 27, 2021).

check[s]" at issue. For this additional reason, the PMA cannot be considered a "collecting bank" under N.Y. U.C.C. § 4-201.[8]

Even if the PMA did operate as a collecting bank during the relevant period by collecting intra-bank checks and presenting them to the various Palestinian banks for payment, that service would have taken place entirely within Palestine, not in the United States. The only aspect of the PMA's payments system that touched New York was the sending of dollar-denominated settlement transfers through the PMA's designated correspondent account at Arab Bank-New York, as the PMA required during the relevant time-period. With respect to PIB, those transfers were processed entirely offshore, through AJIB. Moreover, the PMA required all Palestinian banks, including PIB, to participate in the payments system, and PIB did not direct or control the PMA's designated process for settlement payments, including the PMA's designation of a correspondent account at Arab Bank-New York for that purpose. PIB's required participation in the payments system in Palestine cannot give rise to personal jurisdiction over PIB in New York.

## V. Plaintiffs' Allegation Regarding One Inbound Transfer for HLF Does Not Support a Finding that PIB Transacted Business in New York.

Finally, the district court correctly held that PIB did not transact business in

---

[8] In their opening brief, Plaintiffs assert for the first time that "the PMA collected all of the checks from the participating banks each day," BPA at 30. But the portions of the parties' declarations that Plaintiffs cite (A-226, ¶ 46, A-212, ¶¶ 20-21) provide no support for the proposition that the PMA collected checks from the participating banks, nor does such support appear anywhere else in the record.

New York under C.P.L.R. § 302 when it allegedly received a single wire transfer initiated by HLF through HLF's own bank, BankOne in Texas, which allegedly was routed through AJIB's correspondent bank account at Chase Manhattan Bank. SPA 14, 33-38.[9] The district court found that this transfer did not reflect transaction of business in New York by PIB because "PIB did not exercise control over AJIB's selection and use of its correspondent accounts in New York . . . . Nor did PIB exercise control over the decisions of its customers seeking to transfer dollar-denominated funds into their accounts." SPA-37. Further, this one isolated transaction could not evidence PIB's "selection and repeated use of New York's banking system," as required under *Licci IV,* 732 F.3d at 171. Nor could the alleged HLF transaction constitute "suit-related conduct" by PIB because it occurred outside the relevant time-period as Plaintiffs themselves defined it, and Plaintiffs do not even attempt to draw any causal connection between the transaction and any of the attacks. *See* SPA-16 ("Notwithstanding PIB's alleged role in the HLF transactions, Plaintiffs make no specific allegations about the August 2001 funds transfer being connected

---

[9] That transaction was dated August 23, 2001—<u>before</u> the "relevant period" as defined by Plaintiffs themselves. *Id.*; A-187, ¶ 574; A-208-09. Further, Plaintiffs admit that HLF was not designated as a terrorist by the U.S. government until December 2001, months after the single alleged transaction. A-117-18*,* ¶ 11. Plaintiffs did not plausibly allege that PIB processed any transactions—whether through New York or anywhere else—for HLF after it was designated by the U.S. government. Plaintiffs also do not even attempt to identify any causal connection between the one transaction they alleged in August 2001 and any of the 13 attacks in which they were injured.

- 47 -

to any of the terrorist attacks at issue, nor do they identify any other funds transfers from HLF's account to support terrorist activity."); *see also Licci IV*, 732 F.3d at 171 (for personal jurisdiction under § 302(a)(1), plaintiff must show that the defendant made transfers through U.S. banks that served "as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress."); *Waldman*, 835 F.3d at 342 (deeming irrelevant to personal jurisdiction activities in the United States "that are not proscribed by the ATA and are not connected to the wrongs").

Plaintiffs' reliance on *In re Arcapita,* 549 B.R. 56 (S.D.N.Y. 2016), in an attempt to show that directing another bank to facilitate funds transfers gives rise to an agency relationship, is misplaced, as the district court recognized. That case involved a foreign bank's (Tadhamon) actual exercise of control over the actions of an in-forum bank—making the in-forum bank Tadhamon's agent—by expressly requiring the plaintiff to deposit funds into a New York account. *Arcapita,* 560 B.R. at 68-69 ("The Banks, not Arcapita, set the terms of each placement transaction, and then presented those terms in an offer to Arcapita. … The Banks designated New York correspondent bank accounts to receive the funds from Arcapita."). Importantly, *Arcapita* recognized that Tadhamon "could have received the funds elsewhere" outside New York, but instead "deliberately chose to receive Arcapita's funds … [at] designated correspondent bank accounts in New York … even though they presumably could have performed the Placement transactions without ever directing the funds through New York or anywhere else in the United States." *Id.* at

- 48 -

70 & n.17.  The *Arcapita* court thus likened Tadhamon to the bank in *Licci* that "also could have utilized accounts elsewhere in the world." *Id.* at 70.

Moreover, *Arcapita* involved multiple additional indicia of the foreign bank's control over the New York transactions.  Arcapita hired Tadhamon to make two investments on its behalf, pursuant to an agreement under which Tadhamon would set the terms of the potential investment transaction and make an offer to Arcapita. *Id.* at 61.  Under the agreement, Tadhamon would determine, among other things, the amount and currency of funds that Arcapita would transfer for the investment, the specific bank account into which funds would be transferred, the commodity or securities that Arcapita would invest in, and the rate of return that Arcapita would earn.  *Id.*  Tadhamon had the authority and obligation to control nearly all aspects of the investment transactions under these contractual terms, and the district court found it jurisdictionally relevant that Tadhamon selected U.S. dollars as the currency in which to execute the investment transactions and designated a third party's correspondent bank account in New York to receive and transfer the funds from Arcapita.  *Id.* at 68-69.

By contrast, here, the record is clear that PIB conducted its dollar-denominated business exclusively on a book-to-book basis with AJIB in Amman; that "PIB never controlled how AJIB processed funds to or through the United States"; that "AJIB made its own decisions about whether it would use its own U.S. correspondent banks, and who those correspondents would be"; and that any instructions "to process a

- 49 -

payment to a U.S. bank or bank account . . . simply implemented decisions made independently by, and at the express direction of, the PMA, PIB's customer, or the counterparty to the transaction, not by PIB." A-211-213, ¶¶ 16, 27-29; A-247-48, ¶¶ 6, 10.

Thus, the district court correctly concluded that "PIB did not exercise control over AJIB's selection and use of its correspondent accounts in New York, or AJIB's decision to use correspondent accounts as opposed to another means of clearing and settling U.S. dollar transactions. Nor did PIB exercise control over the decisions of its customers seeking to transfer dollar-denominated funds into their accounts." SPA-37. The court concluded that "Plaintiffs' allegations regarding the August 2001 HLF transaction thus are not enough to tip the balance with respect to PIB's amenability to suit in New York. PIB did not exercise the requisite direction or control over the transactions at issue to support a finding that PIB transacted business in the New York forum through an agent." SPA-38. The court's assessment was not clearly erroneous and it squarely forecloses jurisdiction over PIB for transacting business in New York.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: May 28, 2021                    Respectfully submitted,

                                                 **SQUIRE PATTON BOGGS (US) LLP**

                                                 */s/ Gassan A. Baloul*
                                                 Gassan A. Baloul
                                                 2550 M Street, NW
                                                 Washington, DC  20037
                                                 Telephone: (202) 457-6000
                                                 Facsimile:  (202) 457-6315

                                                 Mitchell R. Berger
                                                 1211 Avenue of the Americas,
                                                 26th Floor
                                                 New York, New York 10036
                                                 Telephone: (212) 872-9800
                                                 Facsimile: (212) 872-9815

                                                 *Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P.32 because this brief contains 12,888 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type of style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word, Times New Roman 14-point.


Dated: May 28, 2021                        */s/ Gassan A. Baloul*
                                           Gassan A. Baloul

                                           *Attorney for Defendant-Appellee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2021, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

Dated: May 28, 2021         */s/ Gassan A. Baloul*
                                      Gassan A. Baloul

                                      *Attorney for Defendant-Appellee*